Richmond

ROBERT C. COUNTS

V.

LILLIE D. COUNTS

June 6, 1980.

Record No. 780734.

Present: All the Justices.

*John J. Curry, Jr.,* for appellant.
*Henry A. Whitehurst* for appellee.

COMPTON, J., delivered the opinion of the Court.

In this appeal of a tort action, we review the trial court's action in sustaining a plea of interspousal immunity. Here, the husband sued his former wife for compensatory and punitive damages, alleging severe injuries intentionally inflicted upon him by his wife's co-conspirator in an abortive murder-for-hire scheme. We are urged to carve another exception to the foregoing doctrine beyond those fashioned in *Surratt* v. *Thompson*, 212 Va. 191, 183 S.E.2d 200 (1971), and *Korman* v. *Carpenter*, 216 Va. 86, 216 S.E.2d 195 (1975).[1]

In March of 1977, appellant Robert C. Counts, the plaintiff below, sued Miles Randolph Turner and appellee Lillie Drew Counts, alleging that Turner maliciously injured the plaintiff in January of 1975 pursuant to an agreement between Turner and Mrs. Counts for the murder of Mr. Counts. The defendants pleaded the two-year statute of limitations and Mrs. Counts filed a demurrer asserting the action was barred by the doctrine of interspousal immunity. The trial court sustained Turner's plea of the statute of limitations as well as Mrs. Counts' demurrer and dismissed the action. Plaintiff sought an appeal from the March 1978 order of dismissal as to Mrs. Counts only, and we granted such request.

Because the suit against Mrs. Counts was decided on demurrer, our recitation of the facts must be based on the allegations of the motion for judgment. Pursuant to the settled rule, we will accept as true all material facts which have been properly pleaded.

During the latter part of 1974, while the Countses were married and cohabiting as husband and wife, she solicited Turner to kill Counts, promising to pay Turner $5,000 for the deed. On January 30, 1975, Turner went to the Countses' home in Pulaski County to carry

---

[1] In *Surratt* this court refused to apply interspousal immunity to bar a wrongful death action brought by the wife's estate against the husband arising from an automobile accident. In *Korman,* we designed another exception to the doctrine and permitted the estate of a wife, who had been murdered by her husband, to sue the committee of the imprisoned spouse for wrongful death.

out the conspiracy and attacked plaintiff, intending to kill him. The effort failed, but plaintiff sustained severe mental and physical injuries during the assault. Because Mrs. Counts concealed her part in the conspiracy from her husband, the couple continued to live together until some time after plaintiff, in March of 1975, discovered his wife's role in the plot.

Subsequently, Turner was convicted of maliciously wounding Counts. Nine years of a ten-year penitentiary term were suspended upon condition that Turner make "restitution" to plaintiff. Charged with conspiring to maliciously wound her husband, the wife was also convicted. She was sentenced to jail and fined. In February of 1977, the Countses' marriage was dissolved by divorce[2] and this action ensued two weeks later.

In sustaining the ex-wife's plea of immunity, the trial judge examined *Korman* and wrote that "the doctrine of interspousal immunity still is the law of Virginia" except in "automobile cases and under the actual facts of *Korman*." He also was of opinion that "[i]f another exception is to be made to the rule, that must be done either by the Supreme Court of Virginia or by the General Assembly."

On appeal, the question is whether the wife is immune from liability in tort for personal injuries intentionally inflicted upon the husband at her direction during the marriage, when the parties are divorced from the bond of matrimony at the time the action is instituted.

Plaintiff urges us to succumb to the current trend and abolish the doctrine of interspousal immunity in its entirety or, in the alternative, to substantially modify the doctrine again to embrace the facts of this case. He points out we have already recognized that a former basis for the doctrine, *i.e.,* the fiction that husband and wife are of "one flesh," is "outmoded," citing *Korman* v. *Carpenter,* 216 Va. at 90, 216 S.E.2d at 197. He also notes we said in *Korman* that another justification for the doctrine, that is, preservation of the marriage, becomes irrelevant when one spouse murders the other thus leaving no "marriage to be saved" and no "union to be preserved." 216 Va. at 90, 216 S.E.2d at 198. Accordingly, the argument continues, when, as here, the action is brought after the parties are finally divorced,

---

[2] We cannot determine from the record on appeal either the ground for divorce, to whom it was awarded, or whether the parties had any children. Counsel indicated at the bar during oral argument that several children were born of the marriage and represented that a "no-fault" divorce was obtained on the ground the parties had lived separate and apart without interruption and without any cohabitation for more than one year. Code § 20-91(9)(a).

there likewise is no marriage to be preserved, and the common-law doctrine of interspousal immunity, as it has evolved and now exists in Virginia in 1980, should not be applied to bar this suit for a purely personal and malicious tort committed by one spouse against the other during coverture. We reject the plaintiff's invitation to abolish the doctrine in toto and we refuse to chisel another exception into the rule to cover the facts of this case.

In *Korman,* we reviewed the history and development of interspousal immunity in Virginia, as articulated in *Keister* v. *Keister,* 123 Va. 157, 96 S.E. 315 (1918), through its abrogation in motor vehicle accident litigation in *Surratt.*[3] *See* 216 Va. at 87-90, 216 S.E.2d at 196-97. We were concerned in *Korman,* as here, with a policy and rule of law designed to protect and encourage the preservation of marriages. There we noted that "[i]nterspousal immunity is only a part of a whole system of laws and policies which recognizes the mutual obligations arising from a marriage and which encourages both marital and family harmony." 216 Va. at 90, 216 S.E.2d at 197.

Nevertheless, in *Korman* we forged an exception to the doctrine and permitted the suit to proceed. There we pointed out that in the automobile context of *Surratt,* the court considered "the high incidence of liability insurance covering Virginia-based motor vehicles, together with the mandatory uninsured motorist endorsements to insurance policies" and concluded that the doctrine "could no longer be supported as promotive of the peace and tranquility of the home." 216 Va. at 88, 216 S.E.2d at 196. We then reasoned that

in light of *Surratt* it would be an anomaly for us to apply interspousal immunity in this case. We would be invoking the doctrine ostensibly to preserve a family relationship which had been voluntarily terminated by the parties; to promote domestic harmony that had disappeared from the marriage; and to save a marriage which had been terminated by the murder of the wife by the husband. The rule of *stare decisis* does not require such specious reasoning.

---

[3] The leading cases on the subject of interspousal immunity, *e.g., Keister, Surratt* and *Korman,* involve suits by a wife, or her personal representative, against a husband, or his personal representative, and deal with an interpretation of Code § 55-36, part of the original Married Woman's Act. But where, as here, the action is by the husband against the wife, the common law immunity doctrine is equally applicable. *Vigilant Insurance Co.* v. *Bennett,* 197 Va. 216, 222-23, 89 S.E.2d 69, 73-74 (1955).

216 Va. at 91, 216 S.E.2d at 198. We observed that if the *Surratt* majority "acted properly in abrogating interspousal immunity" in motor vehicle litigation, its abrogation under the facts of *Korman* was "required." *Id*. We went on to hold "that an action for wrongful death may be maintained, predicated upon injuries to one spouse during marriage arising out of a wrongful act by the other spouse, when such an act results in the termination of the marriage by death, and when the deceased spouse is survived by no living child or grandchild." 216 Va. at 91-92, 216 S.E.2d at 198. We concluded by emphasizing we were deciding only "the narrow question" presented by *Korman's* facts and we restricted the precedential scope of the holding, stating we were "not persuaded that permitting a living spouse to sue for torts committed by one on the other, except in automobile accident litigation, would do otherwise than contribute to the destruction of their marriage." 216 Va. at 92, 216 S.E.2d at 198. We are still not persuaded.

A superficial analysis of *Korman* and the case at bar would reveal no logical justification for abrogating the immunity in the former and applying it in the latter. It would appear on the surface that the policy concern of preserving the marriage would be as irrelevant when the marriage has been ended by divorce as when the marriage has been terminated by death.

But a close examination of the effect on the marriage relationship of permitting a living spouse to sue after divorce for even intentional torts committed during coverture by one on the other dictates a reaffirmance of the immunity doctrine, a concept which is ingrained in the body of law of this State and which is an integral part of the public policy of the Commonwealth to preserve the family unit. Were we to authorize such damage suits, we are confident the availability of such a remedy and the accompanying prospect of a monetary award would contribute to the disruption of many marriages. One example based on an elementary set of assumed facts will serve to illustrate:

The formerly stable marriage of Husband and Wife begins to deteriorate. Finally, in a particularly heated exchange, Husband intentionally strikes Wife causing an injury. Wife then leaves the marital abode and retains an attorney. During the initial consultation, the attorney concludes that Wife is entitled to a divorce on the ground of cruelty and constructive desertion, but nevertheless properly explores the possibility of a reconciliation. Having learned of the injury, the attorney also advises Wife that now in Virginia she may sue Husband

and recover damages for her personal injuries, provided she waits to sue until after the divorce is final. Wife, who would otherwise be inclined to seek a reconciliation leading to ultimate preservation of the marriage, is influenced by the prospect of a damage award and decides to quickly sue for divorce so it can become final before the statute of limitations runs on the personal injury claim. Manifestly, it cannot be successfully argued that in such a situation the likelihood of a damage award "would do otherwise than contribute to the destruction of [the parties'] marriage," as we cautioned in *Korman*, 216 Va. at 92, 216 S.E.2d at 198.[4]

And even if the foregoing scenario did not develop in every situation, the mere availability of such an interspousal action injects into the marriage relationship just one more abrasive and unnecessary ingredient to be added to existing criminal and divorce remedies; the threat would be: "I will not only report your abuse to the criminal prosecutor and seek spousal support in the course of divorcing you, but I will also sue you for damages." We refuse to add by judicial fiat this further impediment to the unity of marriage.

For these reasons, the judgment of the trial court will be

*Affirmed.*

POFF, J., dissenting.

I would not abolish the doctrine of interspousal immunity. Nor do I believe one spouse should have a right of action against the other for damages for every intentional tort. But, recognizing that the doctrine is judge-made and may be refined by this Court when necessary to promote the ends of justice, I would allow the suit in this case.

This is not a case of an "uninvited kiss". The plaintiff has suffered grievous injuries as the result of a deliberate tort planned and committed with cold-blooded, criminal intent by the defendant acting through a hired agent. Although the marriage was not terminated by death caused by the tort as in *Korman v. Carpenter*, 216 Va. 86, 216 S.E.2d 195 (1975), there can be no reasonable doubt that the tort, once discovered by the plaintiff, led to the dissolution of the

---

[4] We observed in *Furey v. Furey*, 193 Va. 727, 71 S.E.2d 191 (1952) (interspousal immunity applied to bar suit for antenuptial tort), that an " 'uninvited kiss, no matter how cold and chaste . . . is an assault and battery, and substantial damages may be awarded for such [and that to abrogate the immunity would create] the possibility of recovering . . . monetary damages by an overkissed [wife or] husband.' " 193 Va. at 733 n.5, 71 S.E.2d at 194 n.5, quoting foreign authority.

marriage by divorce. Since we have rejected the "one flesh" fiction as "outmoded", the sole policy underpinning the doctrine is the societal need "to protect and encourage the preservation of marriages." *Id.*, 216 Va. at 90, 216 S.E.2d at 197. What is left to be preserved here?

The issue here is whether marriage may be asserted as a ground of immunity by a spouse whose wilful criminal conduct has destroyed the marriage. The majority reason that "[w]ere we to authorize such damage suits, we are confident the availability of such a remedy and the accompanying prospect of a monetary award would contribute to the disruption of many marriages." I do not share that confidence.

The fallacy of the majority's reasoning is that it assumes that all intentional torts are alike and the consequences they produce are the same. How many marriages would survive an interspousal tort committed with intent to kill, maim, disfigure, or disable? Such malicious conduct amounts to a repudiation of the marital contract. The typical victim of such conduct would terminate the marriage regardless of the availability of a right of action for damages. Only a spouse with a saintly penchant for absolution or one enervated by fear would decide to continue the marriage. And the decision of such a person would never be substantially influenced by the availability of a right of action for damages. The saintly spouse would not be so venal as to terminate the marriage in order to gain standing to sue; the fearful spouse would forgo the right to monetary damages rather than face the trauma of divorce and the risk of retaliation.

I would hold that when, as here, a spouse has been injured by a tort committed by the other spouse with intent to kill, maim, disfigure, or disable and divorce follows the tort without intervening condonation, the victim may maintain an action for damages against the wrongdoer. If such a rule is an exception to the doctrine of interspousal immunity (and I regard it simply as the kind of refinement the evolving common law necessitates), it does no violence to the policy underlying the doctrine. Instead, it honors the ancient principle that one who suffers a wrong should not be left without a remedy.